CROSNER LEGAL, P.C.
Craig W. Straub (SBN 249032)
craig@crosnerlegal.com
Zachary M. Crosner (SBN 272295)
zach@crosnerlegal.com
9440 Santa Monica Blvd. Suite 301
Beverly Hills, CA 90210
Tel: (866) 276-7637
Fax: (310) 510-6429

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK GONZALEZ, individually, and on behalf of all others similarly situated, | Case No. 2:25-cv-01177 |
| | CLASS ACTION COMPLAINT |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| CELTIC OCEAN INTERNATIONAL, LLC, | |
| Defendant. | |

Plaintiff Mark Gonzalez ("Plaintiff") brings this action against Defendant Celtic Ocean International, LLC, ("Defendant"), individually and on behalf of all others similarly situated, and alleges upon personal knowledge as to Plaintiff's acts and experiences, and, as to all other matters, upon information and belief, including investigation conducted by Plaintiff's attorneys as follows:

### SUMMARY OF DEFENDANT'S CONTAMINATED UNHEALTHY SALT

1.     Defendant sells salt products under its Selina Naturally® Celtic Sea Salt® brand which includes the Fine Ground Celtic Sea Salt® and Light Grey Celtic Sea Salt® (the "Products"). The problem is the Products are contaminated with lead and arsenic.

2.     There are no "safe" levels of lead.

3.     The World Health Organization ("WHO") states: "There is no level of exposure to lead that is known to be without harmful effects." [1]

4.     The U.S. Centers for Disease Control and Prevention ("CDC") states: "There are no safe levels of lead in the blood." [2]

5.     Leading researchers in this area warn: "no level of lead exposure is safe …"[3]

---

[1] World Health Organization, *Lead Poisoning* (Aug. 11, 2023), *available at* https://www.who.int/news-room/fact-sheets/detail/lead-poisoning-and-health (emphasis orignial)

[2] .S. Centers for Disease Control and Prevention, *About Childhood Lead Poisoning Prevention* (May 23, 2024) *available at* https://www.cdc.gov/lead-prevention/about/index.html

[3] Obeng-Gyasi E. Lead Exposure and Cardiovascular Disease among Young and Middle-Aged Adults. Medical Sciences. 2019; 7(11):103. https://doi.org/10.3390/medsci7110103

CLASS ACTION COMPLAINT

6.      Lead affects numerous organs and systems in the body and accumulates over time. This leads to health risks and toxicity, including hindering neurological function, anemia, and kidney damage.[4]

7.      No reasonable consumer would buy the Products if they knew the Products contained toxic and harmful ingredients such as lead and arsenic.

8.      Further, the Products' packaging gives consumers the net impression that the Products are healthy and do not contain toxic heavy metals. The packaging displays large, realistic, and brightly colored images of a worker cultivating salt from water and describes the salt as: "Vital Minerals," "Good Manufacturing Practice" and that is has "won the recommendation of Doctors, Nutritionists, and Chefs worldwide since 1976." Heavy metals would not be recommended by anyone and are not the product of good manufacturing practices as Defendant claims.

9.      Heavy metal testing performed on the Products has been done. The test results revealed that the Products tested positive for **460 ppb of lead** and **140 ppb of arsenic**. These test results are applicable to all the Products as they contain the same or similar ingredients that are sourced from the same areas and the Products are packaged in the same facilities.

10.      Accordingly, Plaintiff brings this action seeking redress for Defendant's false advertising and deceptive conduct on behalf of consumers in the United States and California.

## JURISDICTION AND VENUE

11.      This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action in which: (1) there are over 100 members in the proposed class; (2) members of the proposed class have a different

---

[4] Wani AL, et al., *Lead toxicity: a review*, INTERDISCIP TOXICOL. (June 2015), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4961898

CLASS ACTION COMPLAINT

1   citizenship from Defendant; and (3) the claims of the proposed class members

2   exceed $5,000,000 in the aggregate, exclusive of interest and costs.

3        12.    This Court has personal jurisdiction over Defendant because

4   Defendant conducts and transacts business in the State of California, contracts to

5   supply goods within the State of California, and supplies goods within the State of

6   California. Defendant, on its own and through its agents, is responsible for the

7   formulation, ingredients, manufacturing, labeling, marketing, and sale of the

8   Products in California, specifically in this district. The marketing of the Products,

9   including the decision of what to include and not include on the labels, emanates

10  from Defendant. Thus, Defendant has intentionally availed itself of the markets

11  within California through its advertising, marketing, and sale of the Products to

12  consumers in California, including Plaintiff. The Court also has specific

13  jurisdiction over Defendant as it has purposefully directed activities towards the

14  forum state, Plaintiff's claims arise out of those activities, and it reasonable for

15  Defendant to defend this lawsuit because it has sold harmful Products to Plaintiff

16  and members of the Class in California. By distributing and selling the Products

17  in California, Defendant has intentionally expressly aimed conduct at California

18  which caused harm to Plaintiff and the Class which Defendant knows is likely to

19  be suffered by Californians.

20       13.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b)

21  because Defendant engages in continuous and systematic business activities within

22  the State of California. Venue is further proper pursuant to 28 U.S.C. §1391(b)

23  because a substantial part of the events or omissions giving rise to the claim

24  occurred in this District because Plaintiff purchased one of the Products within this

25  District.  Venue is also proper in this District pursuant to Cal. Civ Code. § 1780(c)

26  because Defendant is doing business in this District, and Plaintiff purchased a

27  Product at issue in this District.

28

1

**PARTIES**

2      14.    Defendant Celtic Ocean International, LLC. is a Delaware

3   corporation that maintains its place of business in Arden, NC.  Throughout the

4   Class Period, Defendant was the manufacturer and distributor of the Products.

5      15.    Plaintiff Mark Gonzalez is a resident of Los Angeles County,

6   California. Plaintiff purchased the Products during the class period. Plaintiff relied

7   on Defendant's deceptive labeling claims and material omissions as set forth

8   below.

9

**FACTUAL ALLEGATIONS**

10    **THE LABELS AND ADVERTISING OF THE PRODUCTS LEAD REASONABLE**

11    **CONSUMERS TO BELIEVE THAT THE PRODUCTS DO NOT CONTAIN TOXIC**

12                        **INGREDIENTS**

13     16.    Defendant is the manufacturer of various salt products. The Celtic

14  Sea Salt brand says it has "been inspected and approved to meet quality standards

15  that live up to our expectations." [5]

16     17.    The labels for each of these products give reasonable consumers the

17  net impression that the Products are healthy and do not contain significant levels

18  of heavy metals.

19     18.    For example, the labels on the Products state:

20     • "Good Manufacturing Practice Quality Product" – with a seal for a

21          purported award the Products received.

22     • "Naturally"

23     • "the best sea salt for those seeking wellbeing and exquisite taste."

24     • "Taste the salt recommended by health professionals and chefs"

25

26

27

28

---

[5] *About us*, CELTIC SEA SALT, *available at* https://www.selinanaturally.com/about-celtic-sea-salt (last accessed February 6, 2025)

4

- "Our 40+ years experience as the leading sea salt brand has given us the knowledge of quality standards you should expect from a high mineral sea salt"
- "Vital Mineral Blend"
- "Regular Inspections at Harvesting Site"
- "The brine has key mineral and trace elements of magnesium, calcium and potassium in the perfect ratio that has won the recommendation of Doctors, Nutritionists, and Chefs worldwide since 1976."
- "… adding essential nutrients to your diet with zero additives."
- "100% responsibly sourced always!"
- "3rd Party Laboratory Analyzed …"

(collectively, the "**High Quality and Healthy Representations**")

19.    "Heavy metals do not provide "exquisite taste," "wellbeing," do not indicate good manufacturing practices or quality standards., and would not be recommended by anyone, let alone health professionals. Further, reasonable consumers do not expect that a product called "Selina Naturally" would be contaminated with lead and arsenic. The net-effect or net-impression of the Products' labeling on consumers is that the Products do not contain any unhealthy ingredients like lead and arsenic.

20.    The packaging of the Products is displayed below:

CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



6





CLASS ACTION COMPLAINT

**HEAVY METAL TESTING OF THE PRODUCTS**

21.   Quantitative analysis of lead, cadmium, arsenic, and mercury by inductively couple plasma mass spectrometry utilizing EPA (ICPMS-QNT-EL-HM) testing protocols, the industry standard, found that the Products contain significant lead and arsenic at the levels shown below:

Celtic Sea Salt Fne Ground

| **ANALYSIS:** | Quantitative analysis of Lead, Cadmium, Arsenic, and Mercury by Inductively Couple Plasma Mass Spectrometry utilizing EPA 3052 (ICPMS-QNT-EL-HM) |
|---|---|

| **RESULTS:** | Element | Result |
|---|---|---|
| | As | 0.14 ug/g |
| | Cd | ND |
| | Pb | 0.460 ug/g |
| | Hg | ND |

22.   The recommended serving size for the Products is 1,500 mg (1.5 grams). This equates to a consumption of 0.69 micrograms of lead *per serving*.

23.   California's Safe Drinking Water and Toxic Enforcement Act of 1986 ("Proposition 65"), Cal. Health & Safety Code § 25249.5, *et seq.* requires a clear and reasonable health hazard warning in connection with the sale of products sold in California that contain 0.5 micrograms (mcg) of lead per maximum daily usage. Just one serving of the Product's exceeds the Proposition 65 levels.

24.   However, Americans eat on average about 3,400 mg (3.4 grams) of sodium per day. [6] The Products contain 480 mg of sodium per serving. The daily intake of sodium for an average American equates to approximately 7 servings of

---

[6] *Sodium in Your Diet*, U.S. Food & Drug Administration, *available at* https://www.fda.gov/food/nutrition-education-resources-materials/sodium-your-diet#:~:text=Americans%20eat%20on%20average%20about,recommended%20limits%20are%20even%20lower (last accessed February 6, 2025).

CLASS ACTION COMPLAINT

the Products per day or 4.83 micrograms of lead per day which is 9.7 times over the Proposition 65 limit.

25.    The American Heart Association recommends no more than 2,300 mg of sodium per day.[7] If a consumer received their daily sodium intake from the Products, they would be consuming 1.06 micrograms of lead in a day if following these guidelines.

26.    Making matters worse, unlike Defendant's Products, <u>other salt products on the market do not contain lead</u>. For example, Jacobsen Salt Co.'s "Pure Kosher Sea Salt" does not contain any detectable levels of lead or arsenic.[8]

27.    Thus, Defendant could have, but failed, to take steps to reduce or remove the lead and arsenic in the Products. Defendant also failed to warn consumers that consuming the Products exposes them to unsafe levels of lead. Instead of informing consumers about the unlawful lead contamination, it -placed the High Quality and Healthy Representations on the labels of the Products to affirmatively mislead its customers.

### EXPOSURE TO HEAVY METALS ARE HARMFUL TO HUMAN HEALTH

28.    The World Health Organization says that "exposure to lead can affect multiple body systems" and that "there is no level of exposure to lead that is known to be without harmful effects."[9]

29.    "Lead can be absorbed by the intestine and through the skin, and almost 90% of it binds to red blood cell proteins. Once inside the human body,

---

[7] American Heart Association, *How much sodium should I eat per day?* (Jan. 5, 2024), available at https://www.heart.org/en/healthy-living/healthy-eating/eat-smart/sodium/how-much-sodium-should-i-eat-per-day#

[8] Rubin, Tamara, *July 2024 Laboratory Test Results for Jacobsen Salt Co. Pure Kosher Sea Salt from Netarts Bay, Oregon* (July 24, 2024) available at https://tamararubin.com/2024/07/june-2024-laboratory-test-results-for-jacobsen-salt-co-pure-kosher-oregon-sea-salt/

[9] *Lead Poisoning*, WORLD HEALTH ORGANIZATION, *available at* https://www.who.int/news-room/fact-sheets/detail/lead-poisoning-and-

lead may travel to different tissues and organs, including the liver and kidneys, where it can cause damage to cells and tissues."[10]

30.    "Lead alters very basic nervous system functions, like calcium-modulated signaling, at very low concentrations in vitro."[11] "Imaging studies of adults who had elevated blood lead levels in childhood have demonstrated region-specific reductions in the brain's volume and alterations of its microstructure, as well as a significant impact on brain reorganization."[12]

31.    "Lead is particularly dangerous because it can accumulate in the body over time, leading to chronic exposure even from small amounts."[13]

32.    Lead exposure and its relation to hypertension have been demonstrated in the literature, with increases in blood lead level increasing blood pressure.[14] "Lead's effect on the cardiovascular system and cardiovascular-related markers has been well noted in the literature. The mechanism by which lead induces hypertension may be related to oxidative stress, inflammation, alterations in the renin–angiotensin–aldosterone system, alteration of vasoactive and volume regulatory hormones, and nitric oxide dysregulation, among other mechanisms."

---

health#:~:text=Lead%20in%20the%20body%20is,measurement%20of%20lead%20in%20blood.

[10] The Institute for Functional Medicine, *Low-Level Lead Exposure and Health Risks* (Nov. 14, 2024) available at https://www.ifm.org/articles/low-level-lead-exposure-implications-human-health

[11]https://www.aap.org/en/patient-care/lead-exposure/lead-exposure-in-children/#:~:text=Lead%20alters%20very%20basic%20nervous,other%20events%20crucial%20to%20development.

[12] *Id.*

[13] MM Coveny, *The Dangers of Lead in Food: Understanding the Risks and Protecting Your Health*, Food Poisoning News (Aug 20, 20224) available at https://www.foodpoisoningnews.com/the-dangers-of-lead-in-food-understanding-the-risks-and-protecting-your-health/

[14] Obeng-Gyasi E. Lead Exposure and Cardiovascular Disease among Young and Middle-Aged Adults. Medical Sciences. 2019; 7(11):103. https://doi.org/10.3390/medsci7110103

CLASS ACTION COMPLAINT

33.    Cancer-specific mortality has been associated with urinary lead levels.[15]

34.    Lead is "known to the state to cause cancer." 27 Cal. Code of Regs. § 27001(b).

35.    "[L]ead exposure results in DNA damage via promoting oxidative stress and the promoter methylation of DNA repair genes in human lymphoblastoid TK6 cells."[16]

36.    Lead exposure at low-levels is a recognized "risk factor for cardiovascular disease."[17] A study examining 14,289 adults in the U.S. found "that concentrations of lead in blood lower than 5 μg/dL (<0·24 μmol/L) are associated with all-cause mortality, cardiovascular disease mortality, and ischaemic heart disease mortality."[18]

37.    No level of lead exposure is safe.[19]

38.    Thus, the lead at the levels present in the Products poses an unreasonable safety hazard to consumers and the Products are not healthy to consume.

---

[15] Li Sen , Wang Jiaxin , Zhang Biao , Liu Yuan , Lu Tao , Shi Yuanyuan , Shan Guangliang , Dong Ling, rinary Lead Concentration Is an Independent Predictor of Cancer Mortality in the U.S. General Population. Frontiers in Oncology;2018;8(ISSN=2234-943X).

[16] Xiangquan Liu1ABCDE, Jingying Wu2BCD, Wenyan Shi3EF, Wenhua Shi4CDF, Hekun Liu5DEF, Xiaonan Wu. Lead Induces Genotoxicity via Oxidative Stress and Promoter Methylation of DNA Repair Genes in Human Lymphoblastoid TK6 Cells. Medical Science Monitor;2018;24:4295-4304.

[17] Prof Bruce P Lanphear, MDa blanphear@sfu.ca · Stephen Rauch, MPHb · Peggy Auinger, MSc · Ryan W Allen, PhDa · Prof Richard W Hornung, DrPH. Low-level lead exposure and mortality in US adults: a population-based cohort study. The Lancet;April 2018;3(4):E177-E185

[18] Id.

[19] Obeng-Gyasi E. Lead Exposure and Cardiovascular Disease among Young and Middle-Aged Adults. Medical Sciences. 2019; 7(11):103. https://doi.org/10.3390/medsci7110103

---

11

CLASS ACTION COMPLAINT

39.    For arsenic, the U.S. Environmental Protection Agency ("EPA") states that "Levels above 10 ppb will increase the risk of long-term or chronic health problems. The higher the level and length of exposure, the greater the risk. … Children are at greater risk ..."[20]

40.    The EPA states that the Maximum Contaminant Level for arsenic is 10 ppb on the basis that arsenic at that level exposes humans to a real risk of developing bladder and lung cancer.[21] "Arsenic ingestion can result in both chronic (long-term) and acute (short-term) health effects." Acute effects include nausea, vomiting, neurological effects such as numbness or burning sensations in the hands and feet, cardiovascular effects, and decreased production of red and white blood cells, which may result in fatigue.[22] Chronic effects include changes in skin coloration, skin thickening, and small corn-like growths, especially on hands and feet.[23] "Chronic exposure to arsenic is also associated with an increased risk of skin, bladder, and lung cancer. There is also evidence that long-term exposure to arsenic can increase risks for kidney and prostate cancer."[24]

41.    "Arsenic is highly toxic in its inorganic form."[25] "Long-term exposure to arsenic from drinking-water and food can cause cancer and skin lesions. It has also been associated with cardiovascular disease and diabetes."[26]

---

[20]https://www.mass.gov/info-details/arsenic-in-private-well-water-faqs#:~:text=The%20current%20drinking%20water%20standard,and%20risk%20for%20the%20fetus.

[21]https://www.mass.gov/info-details/arsenic-in-private-well-water-faqs#:~:text=The%20current%20drinking%20water%20standard,and%20risk%20for%20the%20fetus.

[22] *Id.*

[23] *Id.*

[24] *Id.*

[25] https://www.who.int/news-room/fact-sheets/detail/arsenic

[26] *Id.*

CLASS ACTION COMPLAINT

"Long-term exposure to inorganic arsenic, mainly through drinking-water and food, can lead to chronic arsenic poisoning."[27]

42.    Exposure to arsenic can lead to lower IQ, impaired brain development, growth problems, breathing problems, an unhealthy immune system, and cancer as an adult.[28]

### PLAINTIFF'S PURCHASES OF DEFENDANT'S SALT PRODUCTS

43.    Plaintiff purchased multiple Products in California during the class period. He relied on quality assurances on the packaging on the front and back of the label. He has purchased the Products at a Walmart retail store in California near his home in Los Angeles County. Plaintiff bought the salt Products to consume.

44.    When purchasing the Products, Plaintiff was not aware of the lead and arsenic in them. After reading the label including the High Quality and Healthy Representations, Plaintiff purchased the Products on the assumption that the labeling was accurate, and that the Products did not contain harmful substances like lead or arsenic and that the Products were healthy, high quality, and made using good manufacturing practices as represented on the packaging.

45.    Plaintiff would not have purchased the Products had he known the Products contain lead and arsenic, substances which are known to be hazardous to human health. Plaintiff would not have purchased the Products had he known they are not healthy due to the lead and arsenic contamination. Had Plaintiff known that there are much safer salts on the market like Jacobsen Salt Co.'s "Pure Kosher Sea Salt" which contains no lead or arsenic, he would not have bought Defendant's salt Products. By purchasing the deceptively labeled Products, Plaintiff suffered

---

[27] *Id.*

[28] *Arsenic and Children*, *available at*
https://sites.dartmouth.edu/arsenicandyou/arsenic-and-children/

injury in fact when he spent money to purchase the Products he would not have purchased absent Defendant's deceptive practices.

46.    Plaintiff continues to see the Products for sale at online and at retail stores in California and desires to purchase the Products again if the Products did not contain lead and arsenic or were labeled in a non-deceptive manner. However, as a result of Defendant's ongoing affirmative misrepresentations and material omissions, Plaintiff is unable to rely on the Products' labeling when deciding in the future whether to purchase the Products.

**REASONABLE CONSUMERS ARE DECEIVED BY DEFENDANT'S MISREPRESENTATIONS AND OMISSIONS**

47.    Consumers, like Plaintiff, relied on Defendant's labeling High Quality and Healthy Representations set forth above, including the statements: "Vital Mineral blend," "Doctor Recommended," "Quality Certified" and the back of the package reinforces that the salt is free from harmful substances stating that there is "Regular Inspection at Harvesting Site" "Recommended by Health Professionals," and "Third Party Analyzed[.]" The net-effect or net-impression of the Products' labeling on consumers is that the Products do not contain harmful ingredients like lead and arsenic.

48.    Consumers, like Plaintiff, want to know if a product they eat contains substances which are hazardous to their health. Consumers, like Plaintiff, want to know if a product they eat contains substances which are declared to be unsafe by governmental organizations. Defendant's nondisclosure of the lead and arsenic in the Products is material because reasonable consumers would deem the presence of these substances in the Products to be important in determining whether to purchase the Products. Defendant has exclusive knowledge that the Products contain lead and arsenic.

49.    The fact that Defendant's Products contain lead and arsenic is not reasonably accessible to Plaintiff and consumers. Consumers, like Plaintiff, trust

that the food products they purchase do not contain toxic heavy metals like lead and arsenic which have been intentionally or negligently added to the products. Defendant also has a duty to disclose the presence of lead and arsenic in the Products because the fact is known to Defendant (that the Products contain lead and arsenic), and the failure to disclose the lead and arsenic in the Products is misleading. The lead and arsenic in the Products implicates a health concern that is important to reasonable consumers when deciding to purchase Defendant's Products. This is especially true when the marketer makes a partial omission about the quality of the product like Celtic does here. *See e.g., Doe v. SuccessfulMatch.com*, 70 F. Supp. 3d 1066, 1079 (N.D. Cal. 2014) (a plaintiff need only "allege that Defendant made partial representations that were misleading due to other facts not disclosed, and identify specific representations and omissions.").

50.    A failure to disclose a fact constitutes actionable conduct if the omission goes to the central function of the product. Here, the Products' central function is for people to safely consume the Products. Food products that contain harmful lead and arsenic do not serve this central function. Reasonable consumers, like Plaintiff, would deem it important in determining whether to purchase the Products because Plaintiff would not have purchased the Products had they known that harmful metals like lead and arsenic were in the Products. That is, the omission of the lead and arsenic content of the Products was material because a reasonable consumer would deem it important in determining how to act in the transaction at issue.

51.    A failure to disclose a fact constitutes actionable conduct if the omission causes an unreasonable safety hazard. Here, it is not reasonable to sell a Product that consumer eat with lead and arsenic. This is exacerbated by the fact that the Products' label states that it is "Doctor Recommended," "Quality Certified" and "Vital Mineral blend."

52.     Defendant also made partial representations by using the High Quality and Healthy Representations which indicate that the Products are safe and healthy and do not contain potentially harmful ingredients like lead and arsenic. These partial disclosures are misleading because the lead and arsenic content of the Products was not disclosed.

**PLAINTIFF AND THE PUTATIVE CLASS MEMBERS SUFFERED ECONOMIC INJURY**

53.     Plaintiff and putative class members suffered economic injury as a result of Defendant's actions. Plaintiff and putative class members spent money that, absent Defendant's actions, they would not have spent. With all the other infant and toddler food products on the market without lead and arsenic, a reasonable consumer would choose to purchase a product without lead and arsenic, and not Defendant's Products. Plaintiff and putative class members are entitled to damages and restitution for the purchase price of the Products that were defective, not merchantable, and not fit for their represented purpose. Consumers, including Plaintiff, would not have purchased Defendant's Products if they had known the Products contain lead and arsenic, a substance which has known adverse health effects on humans and especially kids. Defendant did not disclose that the Products contain lead and arsenic.

54.     There are safer alternatives that Plaintiff and class members would have purchased but were denied the benefit-of-the bargain as a result of Defendant's concealment of the lead and arsenic Product. Because lead and arsenic are a hazard to human health, Defendant has a continuing duty to disclose the presence lead and arsenic in the Products to consumers. Defendant has failed to adequately disclose that the Products contain lead and arsenic. Defendant's Products contain a hidden defect and Plaintiff and putative class members suffered economic injury. Had Plaintiff and putative class members known about the lead and arsenic, they would not have purchased the Products or would have paid less for the Products.

55.     Accordingly, Plaintiff brings this action individually and on behalf of other similarly situated consumers to halt the dissemination of Defendant's deceptive advertising message, correct the deceptive perception it has created in the minds of consumers, and obtain redress for those who have purchased the Products. As a consequence of Defendant's deceptive labeling and material omissions, Plaintiff alleges Defendant has violated and is violating California's Consumers Legal Remedies Act, Cal. Civ. Code § 1750 et seq. (the "CLRA"), California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 et seq. (the "UCL") and constitutes a breach of implied warranties.

## NO ADEQUATE REMEDY AT LAW

56.     Plaintiff and members of the class are entitled to equitable relief as no adequate remedy at law exists. The statutes of limitations for the causes of action pled herein vary. Class members who purchased the Products more than three years prior to the filing of the complaint will be barred from recovery if equitable relief were not permitted under the UCL.

57.     The scope of actionable misconduct under the unfair prong of the UCL is broader than the other causes of action asserted herein. It includes Defendant's overall unfair marketing scheme to promote and brand the Products, across a multitude of media platforms, including the Product labels and packaging, over a long period of time, in order to gain an unfair advantage over competitor products. The UCL also creates a cause of action for violations of law (such as statutory or regulatory requirements and court orders related to similar representations and omissions made on the type of products at issue). This is especially important here because Plaintiff alleges Defendant has committed "unlawful" acts and brings a claim for violation of the UCL's "unlawful prong." Specifically, Defendant has violated California's regulatory laws which is not "fair" under the UCL. No other causes of actions allow this claim to proceed, and

thus, there is no adequate remedy at law for this specific violation of the UCL's unfair prong.

58.    Injunctive relief is appropriate on behalf of Plaintiff and members of the class because Defendant continues to omit material facts about the Products. Injunctive relief is a primary remedy sought by this action and is necessary to prevent Defendant from continuing to engage in the unfair, fraudulent, and/or unlawful conduct described herein and to prevent future harm—none of which can be achieved through available legal remedies (such as monetary damages to compensate past harm)..

## CLASS ACTION ALLEGATIONS

59.    Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of the following classes:

**Nationwide Class**
All persons who purchased the Products for personal use in the United States within the applicable statute of limitations until the date class notice is disseminated.

**California Sub-Class**
All persons who purchased the Products for personal use in the California within the applicable statute of limitations until the date class notice is disseminated.

60.    Together, these are referred to as the "Class" unless otherwise indicated. Excluded from the class are: (i) Defendant and its officers, directors, and employees; (ii) any person who files a valid and timely request for exclusion; (iii) judicial officers and their immediate family members and associated court staff assigned to the case; and (iv) those that received a full refund of the Products' purchase price.

61.    Plaintiff reserves the right to amend or otherwise alter the class definition presented to the Court at the appropriate time, or to propose or eliminate

sub-classes, in response to facts learned through discovery, legal arguments advanced by Defendant, or otherwise.

62.    The Class is appropriate for certification because Plaintiff can prove the elements of the claims on a classwide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

63.    <u>Numerosity</u>: Class Members are so numerous that joinder of all members is impracticable. Plaintiff believes that there are thousands of consumers who are Class Members described above who have been damaged by Defendant's deceptive and misleading practices.

64.    <u>Commonality</u>: There is a well-defined community of interest in the common questions of law and fact affecting all Class Members. The questions of law and fact common to the Class Members which predominate over any questions which may affect individual Class Members include, but are not limited to:

a.    Whether Defendant is responsible for the conduct alleged herein which was uniformly directed at all consumers who purchased the Products;

b.    Whether Defendant's misconduct set forth in this Complaint demonstrates that Defendant engaged in unfair, fraudulent, or unlawful business practices with respect to the advertising, marketing, and sale of the Products;

c.    Whether Defendant made material omissions concerning the Products that were likely to deceive the public;

d.    Whether Plaintiff and the Class are entitled to injunctive relief;

e.    Whether Plaintiff and the Class are entitled to money damages and/or restitution under the same causes of action as the other Class Members.

65.    <u>Typicality</u>: Plaintiff is a member of the Class that Plaintiff seeks to represent. Plaintiff's claims are typical of the claims of each Class Member in that every member of the Class was susceptible to the same deceptive, misleading conduct and purchased the Products. Plaintiff is entitled to relief under the same causes of action as the other Class Members.

66.   Adequacy: Plaintiff is an adequate Class representative because Plaintiff's interests do not conflict with the interests of the Class Members Plaintiff seeks to represent; the consumer fraud claims are common to all other members of the Class, and Plaintiff has a strong interest in vindicating the rights of the class; Plaintiff has retained counsel competent and experienced in complex class action litigation and Plaintiff intends to vigorously prosecute this action. Plaintiff has no interests which conflict with those of the Class. The Class Members' interests will be fairly and adequately protected by Plaintiff and proposed Class Counsel. Defendant has acted in a manner generally applicable to the Class, making relief appropriate with respect to Plaintiff and the Class Members. The prosecution of separate actions by individual Class Members would create a risk of inconsistent and varying adjudications.

67.   The Class is properly brought and should be maintained as a class action because a class action is superior to traditional litigation of this controversy. A class action is superior to the other available methods for the fair and efficient adjudication of this controversy because:

a.   The joinder of hundreds of individual Class Members is impracticable, cumbersome, unduly burdensome, and a waste of judicial and/or litigation resources;

b.   The individual claims of the Class Members may be relatively modest compared with the expense of litigating the claim, thereby making it impracticable, unduly burdensome, and expensive to justify individual actions;

c.   When Defendant's liability has been adjudicated, all Class Members' claims can be determined by the Court and administered efficiently in a manner far less burdensome and expensive than if it were attempted through filing, discovery, and trial of all individual cases;

d.   This class action will promote orderly, efficient, expeditious, and appropriate adjudication and administration of Class claims;

CLASS ACTION COMPLAINT

e.    Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action;

f.    This class action will assure uniformity of decisions among Class Members;

g.    The Class is readily definable and prosecution of this action as a class action will eliminate the possibility of repetitious litigation; and

h.    Class Members' interests in individually controlling the prosecution of separate actions is outweighed by their interest in efficient resolution by single class action;

68.    Additionally, or in the alternative, the Class also may be certified because Defendant has acted or refused to act on grounds generally applicable to the Class thereby making final declaratory and/or injunctive relief with respect to the members of the Class as a whole, appropriate.

69.    Plaintiff seeks preliminary and permanent injunctive and equitable relief on behalf of the Class, on grounds generally applicable to the Class, to enjoin and prevent Defendant from engaging in the acts described, and to require Defendant to provide full restitution to Plaintiff and Class members.

70.    Unless the Class is certified, Defendant will retain monies that were taken from Plaintiff and Class members as a result of Defendant's wrongful conduct. Unless a classwide injunction is issued, Defendant will continue to commit the violations alleged and the members of the Class and the general public will continue to be misled.

## FIRST CLAIM FOR RELIEF

### Violation of California's Consumers Legal Remedies Act ("CLRA")

### Cal. Civ. Code §§ 1750 *et seq.*

71.    Plaintiff realleges and incorporates by reference all allegations contained in this complaint, as though fully set forth herein.

72.    Plaintiff brings this claim under the CLRA individually and on behalf of the Class against Defendant.

73.    At all times relevant hereto, Plaintiff and the members of the Class were "consumer[s]," as defined in California Civil Code section 1761(d).

74.    At all relevant times, Defendant constituted a "person," as defined in California Civil Code section 1761(c).

75.    At all relevant times, the Products manufactured, marketed, advertised, and sold by Defendant constituted "goods," as defined in California Civil Code section 1761(a).

76.    The purchases of the Products by Plaintiff and the members of the Class were and are "transactions" within the meaning of California Civil Code section 1761(e).

77.    Defendant disseminated, or caused to be disseminated, through their advertising, false and misleading representations, including the Products' labeling that they do not contain hazardous substances such as lead and arsenic. Defendant fails to disclose that the Products contain lead and arsenic. This is a material omission as reasonable consumer would find the fact that the Products contain lead and arsenic to be important to their decision in purchasing the Products. Defendant's representations violate the CLRA in the following ways:

a)    Defendant represented that the Product have characteristics, ingredients, uses, and benefits which they do not have (Cal. Civ. Code § 1770(a)(5));

b)      Defendant represented that the Product are of a particular standard, quality, or grade, which they are not (Cal. Civ. Code § 1770(a)(7));

c)      Defendant advertised the Products with an intent not to sell the Products as advertised (Cal. Civ. Code § 1770(a)(9)); and

d)      Defendant represented that the subject of a transaction has been supplied in accordance with a previous representation when it has not (Cal. Civ. Code § 1770(a)(16)).

78.     Defendant violated the CLRA because the Products contain lead and arsenic. Defendant knew or should have known that consumers would want to know that the Products contain lead and arsenic. Defendant had a duty to disclose that the Products contain lead and arsenic. Based on the statutory text, legislative history (which includes the National Consumer Act), the judicial decisions and statutes that existed when the CLRA was enacted, the subsequent case law, and the many amendments to the CLRA from 1975 through 2016, failures to disclose material facts are actionable under the CLRA. In particular, subdivision (a)(5), (7), and (9) of Civil Code section 1770 proscribe material omissions. Defendant's labeling of the Products also created the net-impression that the Products do not contain hazardous substances such as lead and arsenic. Defendant had exclusive knowledge of the material fact that the Products contain lead and arsenic, and Defendant failed to disclose this fact. Defendant actively concealed this material fact. The fact that the Products contain lead and arsenic is material to consumers because reasonable consumers would deem the existence of lead and arsenic in a product they eat important in determining whether to buy the Products.

79.     Defendant's actions as described herein were done with conscious disregard of Plaintiff and the Class members' rights and were wanton and malicious.

CLASS ACTION COMPLAINT

80.     Defendant's wrongful business practices constituted, and constitute, a continuing course of conduct in violation of the CLRA, since Defendant is still representing that the Products have characteristics which they do not have.

81.     Pursuant to California Civil Code section 1782(d), Plaintiff and the members of the Class seek an order enjoining Defendant from engaging in the methods, acts, and practices alleged herein.

82.     Pursuant to California Civil Code section 1782, Plaintiff notified Defendant in writing by certified mail of the alleged violations of the CLRA and demand that Defendant rectify the problems associated with the actions detailed above and give notice to all affected consumers of their intent to so act. Defendant failed to rectify or agreed to rectify the problems associated with the actions detailed herein and give notice to all affected consumers within 30 days of the date of written notice pursuant to section 1782 of the CLRA. Thus Plaintiff seeks actual, punitive, and statutory damages, as appropriate.

83.     Pursuant to section 1780(d) of the CLRA, below is an affidavit showing that this action commenced in a proper forum.

**<u>SECOND CLAIM FOR RELIEF</u>**

**Violation of California's Unfair Competition Law ("UCL")**

**Cal. Bus. & Prof. Code §§ 17200 *et seq.***

84.     Plaintiff realleges and incorporates by reference all allegations contained in this complaint, as though fully set forth herein.

85.     Plaintiff brings this claim under the UCL individually and on behalf of the Class against Defendant.

86.     The UCL prohibits any "unlawful," "fraudulent," or "unfair" business act or practice and any false or misleading advertising.

87.     Defendant committed unlawful business acts or practices by making the representations and omitted material facts (which constitutes advertising within the meaning of California Business & Professions Code section 17200), as

set forth more fully herein, and violating California Civil Code sections 1573, 1709, 1711, 1770(a)(5), (7), (9) and (16), California Business & Professions Code section 17500 *et seq.*, California common law breach of implied warranties, and California's Safe Drinking Water and Toxic Enforcement Act of 1986 ("Proposition 65"), Cal. Health & Safety Code § 25249.5*, et seq.*

88.    Proposition 65 provides that "[n]o person in the course of doing business shall knowingly and intentionally expose any individual to a chemical known to the state to cause cancer or reproductive toxicity without first giving clear and reasonable warning to such individual" when the amount of exposure exceeds the "no significant risk level" set by agency regulation. Cal. Health & Safety Code §§ 25249.6. Lead is regulated by this law since lead is "known to the state to cause cancer." 27 Cal. Code of Regs. § 27001(b).  As explained above, a single serving of the Products exceeds Proposition 65 lead levels of 0.5 micrograms per day.

89.    Plaintiff, individually and on behalf of the other Class members, reserves the right to allege other violations of law, which constitute other unlawful business acts or practices. Such conduct is ongoing and continues to this date.

90.    Defendant committed "unfair" business acts or practices by: (1) engaging in conduct where the utility of such conduct is outweighed by the harm to Plaintiff and the members of the a Class; (2) engaging in conduct that is immoral, unethical, oppressive, unscrupulous, or substantially injurious to Plaintiff and the members of the Class; and (3) engaging in conduct that undermines or violates the intent of the consumer protection laws alleged herein. There is no societal benefit from deceptive advertising. Plaintiff and the other Class members paid for a Product that is not as advertised by Defendant. Further, Defendant failed to disclose a material fact (that the Products contain lead and arsenic) of which it had exclusive knowledge. While Plaintiff and the other Class members were harmed, Defendant was unjustly enriched by its false

25

misrepresentations and material omissions. As a result, Defendant's conduct is "unfair," as it offended an established public policy. There were reasonably available alternatives to further Defendant's legitimate business interests, other than the conduct described herein. For example, Defendant's competitors sell salt products that do not contain lead and arsenic—Jacobsen Salt Co.'s "Pure Kosher Sea Salt" does not contain any detectable levels of lead or arsenic.[29]

91.   Plaintiff and the other members of the Class have in fact been deceived as a result of their reliance on Defendant's material representations and omissions. This reliance has caused harm to Plaintiff and the other members of the Class, each of whom purchased Defendant's Products. Plaintiff and the other Class members have suffered injury in fact and lost money as a result of purchasing the Product and Defendant's unlawful, unfair, and fraudulent practices.

92.   Defendant's wrongful business practices and violations of the UCL are ongoing.

93.   Plaintiff and the Class seek pre-judgment interest as a direct and proximate result of Defendant's unfair and fraudulent business conduct. The amount on which interest is to be calculated is a sum certain and capable of calculation, and Plaintiff and the Class seek interest in an amount according to proof.

94.   Unless restrained and enjoined, Defendant will continue to engage in the above-described conduct. Accordingly, injunctive relief is appropriate. Pursuant to California Business & Professions Code section 17203, Plaintiff, individually and on behalf of the Class, seek (1) restitution from Defendant of all money obtained from Plaintiff and the other Class members as a result of unfair

---

[29]Rubin, Tamara, *July 2024 Laboratory Test Results for Jacobsen Salt Co. Pure Kosher Sea Salt from Netarts Bay, Oregon* (July 24, 2024) available at https://tamararubin.com/2024/07/june-2024-laboratory-test-results-for-jacobsen-salt-co-pure-kosher-oregon-sea-salt/

CLASS ACTION COMPLAINT

competition; (2) an injunction prohibiting Defendant from continuing such practices in the State of California that do not comply with California advertising laws; and (3) all other relief this Court deems appropriate, consistent with California Business & Professions Code section 17203.

**THIRD CLAIM FOR RELIEF**

**Breach of Implied Warranties**

95.    Plaintiff realleges and incorporates by reference all allegations contained in this complaint, as though fully set forth herein.

96.    Plaintiff brings this claim individually and on behalf of the Class against Defendant.

***Implied Warranty of Fitness For A Particular Purpose***

97.    "An implied warranty of fitness for a particular purpose arises only where (1) the purchaser at the time of contracting intends to use the goods for a particular purpose, (2) the seller at the time of contracting has reason to know of this particular purpose, (3) the buyer relies on the seller's skill or judgment to select or furnish goods suitable for the particular purpose, and (4) the seller at the time of contracting has reason to know that the buyer is relying on such skill and judgment." *Keith v. Buchanan*, 173 Cal. App. 3d 13, 25 (1985).

98.    Defendant was at all relevant times the manufacturer, distributor, and/or warrantor of the Products. Defendant knew or had reason to know of the specific use for which its Products were purchased.

99.    Defendant, through the acts and omissions set forth herein, in the sale, marketing, and promotion of the Products made implied representations to Plaintiff and the Class that the Products were fit for the particular purpose of use: that people can safely consume the Products and that the Products are healthy for people. However, the Products are hazardous to consume and are not healthy.

***Implied Warranty of Merchantability***

100.    At the time the Products were sold, Defendant knew or should have

27

**CLASS ACTION COMPLAINT**

known that Plaintiff and members of the Class would rely on Defendant's skill and judgment regarding the safety and composition of the Products. Because the Products contain lead and other heavy metals, they are not of the same quality as those generally accepted in the trade and were not fit for the ordinary purposes for which the Products are used (i.e., to be eaten).

101.   The implied warranty of merchantability "provides for a minimum level of quality" in a good. *Am. Suzuki Motor Corp. v. Superior Court*, 37 Cal. App. 4th 1291, 1296 n. 2 (1995).

102.   To state a claim for breach of the implied warranty of merchantability, a plaintiff must allege a "fundamental defect that renders the product unfit for its ordinary purpose." *T & M Solar & Air Conditioning, Inc. v. Lennox Int'l Inc.*, 83 F. Supp. 3d 855, 878 (N.D. Cal. 2015); *see also Mexia v. Rinker Boat Co.*, 174 Cal. App. 4th 1297, 1303 (2009) ("The core test of merchantability is fitness for the ordinary purpose for which such goods are used."). "Such fitness is shown if the product is in safe condition and substantially free of defects[.]" *Mexia*, 174 Cal. App. 4th at 1303.

103.   "In cases involving human food, a party can plead that a product violates the implied warranty of merchantability through allegations that the product was unsafe for consumption, contaminated, or contained foreign objects." *Barnes v. Nat. Organics, Inc.*, 2022 WL 4283779, at *8 (C.D. Cal. Sept. 13, 2022) (citing *Thomas v. Costco Wholesale Corp.*, 2014 WL 5872808, *3 (N.D. Cal. Nov. 12, 2014).

104.   Here, the Products are consumed. The Products contain a dangerous substance which compromises the safety and fitness for consuming the Products. *See Barnes*, 2022 WL 4283779, at *8 (finding breach of implied warranty sufficiently pleaded where plaintiffs alleged that the product promoted a healthy pregnancy but was actually contaminated with heavy metals and was thus not favorable for pregnancy); *Rodriguez v. Mondelez Glob. LLC*, 703 F.Supp.3d 1191,

1212-13 (S.D. Cal. 2023) (same where plaintiffs alleged that the products were unsafe for consumption because they contained levels of lead).

105. By advertising and selling the Products at issue, Defendant, a merchant of goods, made promises and affirmations of fact that the Products are merchantable and conform to the promises or affirmations of fact made on the Products' packaging and labeling, and through its marketing and advertising, as described herein. This labeling and advertising, combined with the implied warranty of merchantability, constitute warranties that became part of the basis of the bargain between Plaintiff and members of the Class and Defendant.

106. Defendant's labeling and advertising, combined with the implied warranty of merchantability, constitute a warranty that the Products do not contain hazardous substances such as lead.

107. In reliance on Defendant's skill and judgment and the implied warranties of fitness for this purpose and merchantability, Plaintiff and members of the Class purchased the Products to be consumed. Defendant knew that the Products would be purchased and used without further testing by Plaintiff and Class members.

108. Consumers are the intended beneficiaries of the implied warranty as they are the ones Defendant made the Products for and specifically marketed the Products to consumers. Defendant breached the implied warranty of merchantability. Because the Products contain lead, they are not fit for ordinary use (i.e., consumption).

109. As a direct and proximate result of Defendant's breach of warranty, Plaintiff and members of the Class were harmed in the amount of the purchase price they paid for the Products.

110. Further, Plaintiff and members of the Class have suffered and continue to suffer economic losses and other damages including, but not limited to, the amounts paid for the Products, and any interest that would have accrued on

those monies, in an amount to be proven at trial. Accordingly, Plaintiff seeks a monetary award for breach of warranty in the form of damages, restitution, and/or disgorgement of ill-gotten gains to compensate Plaintiff and the Class for the loss of that money, as well as injunctive relief to enjoin Defendant's misconduct to prevent ongoing and future harm that will result. Injunctive relief is the primary goal of this litigation.

111. Plaintiff seeks punitive damages pursuant to this cause of action for breach of warranty on behalf of Plaintiff and the Class. Defendant's unfair, fraudulent, and unlawful conduct described herein constitutes malicious, oppressive, and/or fraudulent conduct warranting an award of punitive damages as permitted by law. Defendant's misconduct is malicious as Defendant acted with the intent to cause Plaintiff and consumers to pay for Products that they were not, in fact, receiving. Defendant willfully and knowingly disregarded the rights of Plaintiff and consumers as Defendant was aware of the probable dangerous consequences of its conduct and deliberately failed to avoid misleading consumers, including Plaintiff. Indeed, on October 27, 2024, Defendant received a notice that it was violating California Health & Safety Code section 25249.6 due to the high level of lead contamination in the Products. Instead of fixing the problem, Defendant has ignored it and continues to poison its customers with unsafe levels of lead in its Products.

112. Defendant's misconduct is oppressive. Reasonable consumers would look down upon it and/or otherwise would despise such misconduct. This misconduct subjected Plaintiff and consumers to cruel and unjust hardship in knowing disregard of their rights. Defendant's misconduct is fraudulent as Defendant, at all relevant times, intentionally misrepresented and/or concealed material facts with the intent to deceive Plaintiff and consumers. The wrongful conduct constituting malice, oppression, and/or fraud was committed, authorized, adopted, approved, and/or ratified by officers, directors, and/or managing agents

of Defendant.

## REQUEST FOR RELIEF

Plaintiff, individually, and on behalf of all others similarly situated, requests for relief pursuant to each claim set forth in this complaint, as follows:

a.      Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiff as the Class Representative and appointing the undersigned counsel as Class Counsel;

b.      Ordering restitution and disgorgement of all profits and unjust enrichment that Defendant obtained from Plaintiff and the Class members as a result of Defendant's unlawful, unfair, and fraudulent business practices;

c.      Ordering injunctive relief as permitted by law or equity, including enjoining Defendant from continuing the unlawful practices as set forth herein, and ordering Defendant to engage in a corrective advertising campaign;

d.      Ordering damages for Plaintiff and the Class;

e.      Ordering Defendant to pay attorneys' fees and litigation costs to Plaintiff and the other members of the Class;

f.      Ordering Defendant to pay both pre- and post-judgment interest on any amounts awarded; and

g.      Ordering such other and further relief as may be just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury of all claims in this Complaint so triable.

Dated: February 11, 2025                CROSNER LEGAL, P.C.


                                        By:      */s/ Craig W. Straub*
                                              CRAIG W. STRAUB

                                        Craig W. Straub (SBN 249032)
                                        craig@crosnerlegal.com
                                        Zachary M. Crosner (SBN 272295)
                                        zach@crosnerlegal.com
                                        9440 Santa Monica Blvd. Suite 301
                                        Beverly Hills, CA 90210

31

Tel: (866) 276-7637
Fax: (310) 510-6429

Attorneys for Plaintiff

**Civil Code Section 1780(d) Affidavit**

I am an attorney duly licensed to practice before all of the courts of the State of California. I am one of the counsel of record for Plaintiff. This declaration is made pursuant to § 1780(d) of the California Consumers Legal Remedies Act. Defendant has done, and are doing, business in California, including in this district.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed February 11, 2025 at San Diego, California.

By:    */s/ Craig W. Straub*
       CRAIG W. STRAUB

       Attorney for Plaintiff

CLASS ACTION COMPLAINT